and number 1767, Rosie D. et al. v. Charles D. Baker et al. Thank you. Good morning, Your Honor. Daniel Hammond, Assistant Attorney General for the Appellant here in Mass Health. With the Court's permission, I'd like to reserve two minutes at the end for rebuttal. Yes. Thank you, Your Honor. Your Honor, when the District Court here denied Mass Health's motion in 2018 to terminate monitoring and reporting requirements in this case, it committed two distinct errors of law that this Court should review and reverse. First of all, it failed to give any effect to the language in paragraph 52 of the 2007 judgment in this case that said that while the Court would retain jurisdiction going forward to ensure implementation, the monitoring and reporting requirements, quote, will terminate in five years from the date of this judgment. Five years from the date of the judgment was the summer of 2012. Those requirements did not terminate then or at any time in the future until in 2018 Mass Health filed a motion asking that that paragraph of the judgment be given effect and that the monitoring and reporting requirements end. At that time, the Court made clear that it would entertain such a motion only if the Commonwealth could demonstrate that it had fully complied with all of the substantive terms of the judgment. And then and only then would the monitoring period end. That brings us to the second error here, which is when the Court denied... So the Commonwealth made an extensive evidentiary showing in 2018 that it had, in fact, complied with every paragraph and every command of the 2007 judgment. When the Court denied the Commonwealth's motion, it denied it not because it disbelieved any of those assertions or found, indeed, that any term of the judgment had not been complied with. Rather, it found that because not all children in the Commonwealth, not all of the eligible children here had received one of the six new services, the intensive care coordination or ICC service, within a 14-day period that the Commonwealth had contractually imposed upon its providers, that that failure, in and of itself, was tantamount to noncompliance with the judgment or failure to comply fully with the judgment and, therefore, justified denial of the Commonwealth's motion and essentially indefinite continuance of the monitoring period. Aren't you leaving out one piece? I thought the 14 days was put in what was purported to be an enforcement order, enforcing the terms of the judgment. Wasn't that the basis that the Court relied on? The Court did enter... Actually, first of all, no. The Court did not expressly cite that. Plaintiffs cite that as one of the alternative grounds where authority could be found, and I'll certainly get to that, but my first point, and I can't underline it strongly enough, is that the judgment, as written, did not contain this term. Did not contain what term? Fourteen days? The 14-day or, indeed, any numerical standard by which any of the remedy services had... That wasn't my question. My question was whether the 2018 decision referred to that order incorporating those terms, not the judgment, but the... In 2012? Yes. I'm sorry. It's the 2012 order. Yes. Your opponent says that effectively modified the judgment, and so you can't just rely on the 2007 judgment. So that's what we're asking about. I understand. And no, the 2018 order did not expressly identify the 2012 order as an independent ground for its decision. The plaintiffs do. The court did not. The court actually put forward several alternative theories as to why it could look to the 14-day standard as a term of the judgment, and therefore as a ground for denying our motion, MassHealth's motion. One was this idea that the timeliness requirement, the 14-day requirement, was somehow already at the 2005 trial in this case and the 2006 liability determination, the court found that the commonwealth had violated the reasonable promptness provision of the Medicaid Act, and that because of that finding, that somehow the 14-day standard was therefore incorporated into the judgment and without any further action from the court. And our response to that is fairly straightforwardly. Judgments do not have subtext. As this court said... Judgments do not have what? Subtext. They have text. The commonwealth was entitled to rely on the text of the judgment when it made its showing that it had complied with the judgment. But counsel, that 2007 judgment contemplates that tasks that are identified for the commonwealth to pursue to meet the requirements of the judgment will result in greater specificity. And that seems to be quite clear in the judgment. The judgment is not the last word. I mean, there are a lot of things that the commonwealth now has to do to implement the judgment, including giving specificity to this reasonable promptness requirement. Both the statute and the Medicaid regulations contemplate that the state will be in a position to give some definition to that reasonable promptness requirement, and that's exactly what the state did in 2012 when it asked to be relieved from the three-day requirement and said, we think for purposes of implementing this ICC requirement, we need 14 days. The plaintiffs objected to that. They thought it was too long, but the judge accepted that. So, you get the sense of my question. Please go ahead. I do, but I think it's also important to recognize what the 2012 adoption of the 14-day standard for ICC was and what it wasn't. The commonwealth adopted the 14-day standard in conformity with an EPSDT Medicaid regulation, which we set up in the brief, that specifically directs that all state Medicaid agencies must set timeliness standards for the actual deliverers of the service, the agencies with whom the  service is delivered. It did this because it was required to, but it also did it in the context of the litigation, because the plaintiffs had approached the court in fall of 2011 and said, look, the commonwealth hasn't done this. They have not adopted any timeliness standards in their contracts with their providers, and so the only number we have is this sort of hortatory three-day standard that had been set forward in the initial description of the service before it was even brought online, and in the absence of anything else, court, you should enforce that three-day standard as the timeliness standard under the regulation. The commonwealth instead, as the regulation contemplates, consulted with medical experts in the field and, based on their recommendation, came forward and said, yes, we're going to adopt this 14-day standard for our contractors, which we can enforce against our contractors if and when we find that there are systemic problems with an individual contractor, and it gives us a contractual tool to ensure that they comply. It's not a freestanding, enforceable provision, certainly of the judgment. The 2012 order, in 2012, the judgment was never modified. The court never expressly said it was modifying, and, in fact, on two subsequent occasions, the plaintiffs have made motions to the court. Absolutely. What was it then? I mean, it was just the commonwealth represents that we think we should have 14 days to implement this requirement. I gather that the commonwealth is saying we will set about to do that. Right. Is that just aspirational? It has no element of enforcement? There's nothing obligatory about it? It's just, again, just an aspiration? No, it's not aspirational, but it's a management tool that the commonwealth uses against its own contractors. It's not something that the court can enforce against the commonwealth. And, again, it was, as I was starting to say, on two separate occasions, the plaintiffs asked the court to add that 14-day standard as part of, to modify the judgment to add the 14-day standard. They did it a little bit obliquely in that, as you've seen from the record, there were extensive disengagement negotiations that took place in this case from 2012 forward. One of the disengagement terms proposed by the plaintiffs was to articulate the year-over-year improvement in the percentage of children who were receiving the ICC service, receiving their first consultation within 14 days. And so the court adopted as an aspirational disengagement measure this annual year-over-year improvement. The plaintiffs came to the court and said, please, court, add that to the judgment. Make that an enforceable term of the 2007 judgment. On both occasions, the court denied that motion without prejudice. And certainly the plaintiffs would not have moved to add that as a term to the judgment if they believed it was already there. So the 2012 judgment, I'm sorry, the 2012 order, whatever it is, it's not a term of the judgment. And it is not, and failure to meet that standard, even if proved, could not have been a ground for the denial of the Commonwealth's motion to terminate monitoring six full years after it was supposed to have terminated, on a finding that just because of their failure to comply with this term, they were out of compliance with the judgment. Counsel, I have some questions about what the Commonwealth is really seeking here. As the plaintiffs point out, you have not moved for relief from the injunction. You have moved only for relief from the monitoring and reporting requirements. They draw some significance from that. Your motion also states three separate grounds. It does not expressly refer to Rule 60B-5, although your second ground cites both Milliken, which is a general equitable jurisdiction case, and Horn v. Flores, which is explicitly a Rule 60 case. That seemed to suggest an argument that times have changed. There are, under the Supreme Court's command in both of those cases, equitable reasons to now move on. But I'm not sure what you're asking us to move on from. There are, I think, three or four different grounds where you said, give us relief. The district court sort of didn't even adjudicate several of the grounds on the basis that, well, it had reached a decision on one ground, and that took care of the analysis. So I take it you're asking for a remand. What sort of remand are you asking for? Well, to be clear, Your Honor, and I'm glad you asked the question. I would have answered it anyway. If you had gotten to it and I had skipped to it. Yes. We did not move under Rule 60B-5 precisely because we're not asking for relief from the judgment at all. We're asking merely for the specific enforcement of a term of the judgment, namely the sunsetting of the monitoring period after five years or, at this point, after 12 years. What does that mean? Where does that leave the plaintiffs? I'm sorry? I don't understand what you mean. I'm very practical. You leave the injunction in place. You remove the monitoring and reporting requirements. Well, the court in the memorandum that it issued, along with the judgment in 2007, drew a distinction between its retention of jurisdiction to ensure implementation of the decree with the monitoring and reporting requirements, which it precisely saw as finite, as lasting the first five years of the case, I think roughly tracking with the period when the new services were being brought online, when the court imagined that it would need the eyes and ears of the monitor as part of the implementation process. So this is about the monitor not being the eyes and ears of the plaintiffs in the future? Let's assume hypothetically that your motion is allowed on remand. And let's assume two or three years from now, I don't know, economic disaster hits the Commonwealth and they stop providing these services. So what are plaintiffs to do then if the injunction is still in effect? They can come back to this court. They don't need to file a new lawsuit. I think that's what the district court had in mind in keeping jurisdiction over this matter, so that if there was an allegation, precisely what your Honor just said, if there was an allegation that the Commonwealth had ceased to perform under the injunction, the plaintiffs could come back within this docket, within this lawsuit, and file a motion with the court, whether it be a contempt motion, whatever form that motion might take. There's a vehicle for the plaintiffs to seek further enforcement. Counsel, you keep talking about the sunset provision with respect to the end of the monitoring, and yet for years there was an agreement that would be extended for six months, six months, six months. That's absolutely correct, yes. Are those agreements of no significance? Do they not represent an agreed-upon modification of the judgment? And the judgment contemplates that the judgment can be amended by agreement. If everybody agrees on a six-month extension, why isn't that an amendment to the judgment by agreement? Well, I'm not sure there are modifications to the judgment, but they're certainly enforceable. And we're not arguing that there was error going back to 2012. What is, not to belittle your argument, what is so sacrosanct about the five-year sunset provision when the Commonwealth repeatedly, and to your credit, I'm not being critical of it, I'm just trying to understand your argument, that you agree to the six-month extension. In fact, at one point, when they suggested six months, you said, well, let's just go with it. We should do this until the end of the year. Well, that is because, again, the judgment said we'll terminate. But it did not provide any process for how that comes to be. In 2012, when we were approaching the sunset date, when we were approaching the five-year anniversary, the court made clear that its preferred endgame for this case was for the plaintiffs and the defendants to go back and negotiate a set of disengagement criteria, which, if accomplished, would provide kind of almost an ADR, an alternative route out of the litigation. The court was very clear that that was how it preferred to end the case. The court at the time said that it was not even going to address what kind of motion practice it would contemplate for if we tried to enforce the five-year sunset provision. The court explicitly said it had no view as to who would even bear the burden of proof in such motion practice, and instead suggested very strongly that it would prefer that this case end by consensus. And so we accepted that invitation in 2012 and began on what turned out to be a six-year path that ultimately did not lead to a consensus route out of this litigation. And so in 2018, for the first time, MassHealth did not agree to a proposed extension of the monitoring term, and in so doing, took on the burden of filing the motion and making the evidence you're showing. Can I ask a final question from you? I know you don't agree with them, I'm sure you don't agree with them, but you do not challenge any of the factual findings that the district court made when it chose to deny your motion to end the monitoring. The court made extensive factual findings with respect to the ICC program. You don't challenge any of those, do you? We don't challenge them. Again, as you understand, our point is we shouldn't even be having this discussion because that's not a term of the judgment. That being said, all of the numbers that resulted in court findings emanated from MassHealth. If the plaintiffs alleged a new violation of the Medicaid Act and we were defending that lawsuit, I think we would contest which numbers are the proper numbers to measure the timely delivery of services here, and I'll just very quickly point out that in our evidentiary filing, in MassHealth's evidentiary filing, we put forward numbers that said just for the ICC service, over the 10 years that the service has been up and running, 78% of youth have received their first visit within the 14 days, and that that number goes up to 88% within 28 days. We think that's the more appropriate quantification of how the system is running in terms of timeliness, so we do have a quarrel with which numbers the court decided to front line, but this is not a factual dispute. This is a pure question of law as to whether the court could have denied our motion. First of all, whether the court should have held us to any showing at all to get the benefit of the term that the court put in the 2007 judgment, and second of all, if it was going to hold us to that burden, could it have used the term not in the four corners of the judgment as the basis for denying that motion? That's our argument. I have a question. Your opponent argues that Massachusetts is an outlier at 14 days, that other states, when they define the time period as federal law requires them to define, it's usually less than 14 days. They make that assertion based on evidence that I think is several years old. What's the answer? The answer goes a little bit beyond the record here. I just want to stipulate that, but we have looked into that because it's an assertion that the plaintiffs have been making for some time in this litigation, and unfortunately I think the honest answer to that question is that it is very hard to get apples to apples to make an interstate comparison on this, and that's because different states, first of all, define their classes very differently, the class of eligible children. So for states or even municipalities that have programs like this, obviously with a smaller denominator, a smaller number of children who can access the service, it's not nearly as difficult to get all of them in within a specified number of days. Yes, I do have the point. Yes, I think there are other differences. So you're saying that the whole notion of comparison with other states just based on this little bit of data doesn't work? I think that's correct. I would just very quickly add one other variable from state to state is what's considered the first contact. There are some states that a phone call is enough to have sort of stopped the clock for the first encounter with the newly referred child. That's not the way the Massachusetts system works. The Massachusetts measures the first actual sit-down meeting with the therapist. So I'd like to ask you just one question as well. I know we're taking a lot of your time. So a ruling by us in your favor ultimately results in the end of the monitor program. That is the relief we have sought, yes. But the plaintiffs can still come back in and attempt to establish that there's been a violation of the injunction in terms of these timely ICC services. Well, I would answer that question by reference to this court's decision in Harvey, which we cite in the brief, which is that basically post-judgment enforcement proceedings are limited to the four corners of the judgment. Yes. But you said earlier that if they could show a violation of the injunction, they have the right to come back in this litigation and do that. Yes. I think what I'm contesting is the idea that this would constitute a violation of the injunction. I think our whole case is predicated on the idea that it's not. Are you referring just to the 14 days? The 14, yes. Okay, well, I'm not. I'm talking about timely provision of ICC services, which I think the judgment does cover. Well, it covers that topic in the sense that it gives discretion to MassHealth to set the parameters. So if they come back and they allege a violation of the injunction and they establish to the satisfaction of the district court that there's been a violation, could the imposition or reimposition of a monitor be part of the relief? Is there anything that would prevent the district court from doing that? Well, again, I hesitate to challenge your premise. Because I know that's not the purpose of your question. The premise is simply that they establish to the satisfaction of the district court judge a violation of the injunction. Yes. And on any other – on any topic that is specifically dealt with by an injunction? Yes. Okay, yes. Yes. But, again, if the allegation is that there is a reasonable prominence violation, our argument then would be what our argument is now, which is that does require a new complaint and a new trial because that is a new allegation. So my real question – I just want to make sure that we're in agreement on – what I thought we were in agreement on, which is that as part of the relief for showing a violation of the injunction, there could be the reimposition of a monitor. Yes. Okay. Yes. Thank you. I'm sorry. It's an important case. I don't think we're going to – we should apologize for prolonging it. These are important issues. Not at all, Your Honor. What I have trouble understanding is that you keep going back to the original judgment. Yes. If the language is not there, there's nothing enforceable about it. When you look at that 2007 judgment, it is, in a sense, aspirational. It talks about tasks that the Commonwealth has to implement. It contemplates specifying performance standards, structural requirements, process specifications, all those kinds of things. And so I guess in light of those sort of generalities, you could say, well, there's no specification of clinical criteria, no specification of performance standards, no specification of structural requirements, so there's nothing to enforce. But that seems, with all due respect, that that seems to me a kind of circular argument. The original judgment contemplates the development of greater specificity. The greater specificity is found in part in that 2012 order, but you say, but that was never made part of the judgment, so what happened in 2012 is completely irrelevant to the extent that they're arguing that you haven't complied with the 14-day requirement. Sorry, that never got formally modified as part of the judgment. All we're left with are these sort of general aspirational standards. There's nothing enforceable about it. Well, actually, no, I appreciate your question. Sure. But I do think that's not quite a fair description of the 2007 judgment. Even where it relates specifically to ICC, there are a number of provisions set out over multiple pages that are highly specific about what the service must contain. It must contain a care manager. It must contain a care team composed of, and it lists out all of these stakeholders that should be involved in each child's team. There are highly specific provisions about what the service is supposed to be, what it's supposed to do. And then there is the more general paragraph 38C, I believe, that talks about the tasks that the agency will have to do as the steward of the system to figure out how to make the system work. The nuts and bolts are left to the discretion of the agency. The agency must do these things, but by definition, the court is not trying to ossify any of these individual commands and put them into the judgment. It's just saying you have to go out and do these things as part of the blocking and tackling of setting up the system. But the highly specific commands about what ICC must contain and who must receive it are entirely enforceable, and we would certainly suggest that our evidence you're showing demonstrates that we have complied with them. Thank you. One more question. Since the district court did not reach other issues, wouldn't we have to remand anyway? I think that I'm very reluctant to say yes to that question. But intellectual honesty may compel it. I don't think the district court left us or you any other alternative there. The court expressly said in numerous places it's not reaching any other Perhaps it should have, but as you said, it was setting up the case for appeal. Okay, thank you. I don't think I said that, but yes. Thank you, Your Honor. May it please the Court. This Court should affirm the district court's refusal to terminate monitoring for two distinct reasons. First, the district court judge made uncontroverted factual findings that the very same violations of the Medicaid Act that it had found in 2006 and incorporated in two separate remedial orders in 2007 continued to this day and denied vulnerable children necessary treatment. Second, the defendants persistently have failed to comply with the district court's 2012 remedial order, which this court has asked about, which was entered in response to a motion for noncompliance, which adopted the defendants' own timeliness standard, and which was never appealed. In reaching these two conclusions, I think it's significant that this district court judge, throughout the history of the case, has consistently deferred to the defendants. It adopted their own remedial plan. It then allowed modifications to that plan and extensions of timelines. It then applied and adopted the MassHealth's own timeliness standard and then refused to order the disengagement measures that the defendants objected to. Let me just turn first to the law. There are two provisions of the Medicaid Act which require timely treatment for children. First, the EPSDT regulation, which this court has noted, and second, the reasonable promptness provision of the Medicaid Act itself. As Amiki, the American Academist of Pediatrics in his local chapter makes clear, that the history and recent federal guidance on both of those provisions require that states must establish timeliness standards for the provision of treatment. They must do it in conjunction with medical professionals, and then they must comply with their own standards. And what is the remedy for that in terms of the federal government? Do they then, if the federal government were to find noncompliance with the reasonable promptness requirement, what would the federal government do? So the federal government has at its disposal, as the court is aware, procedures for both investigating and then, if necessary, imposing sanctions on a state through Medicaid. And they can decertify a state plan in the end if it comes to it. Now, has the federal government taken any of those steps at any point in this case as to the reasonable promptness requirement? It has not taken any action. There has been no complaint by anyone to the federal government. What the federal government did do in issuing recent guidance on EPSDT is note that in Massachusetts, pursuant to the court order in this case, a range of services were created, time when the standards were adopted, and that those are now binding. In fact, the Rosie D. case was ---- What do you mean by binding? What did they mean by binding? That the states are ---- That the state has complied by adopting this 14-day requirement for its contractors. No, and that ---- And they're bound by that. That's correct. In Medicaid terms. That's correct. Okay. Thank you. That is just helpful background. The judgment actually does not, the 2017 judgment, does not incorporate a 14-day requirement. And no federal regulation incorporates a 14-day requirement. So if one looks purely to the text, and there's a significant question about that, then the answer is it's not part of the injunction. And the district court committed error in reading the injunction to do that. If you accept that premise, then what happens to this case? If I understand your question, Your Honor, and I would stress that we don't accept the premise. I know you don't agree. Let's assume you accept the hypothetical that the district court was bound by the text and the text did not involve these terms, either in 2012 or in 2007. Accept that premise. Then what happens to this case? You would remand to the district court. It has now been assigned to a new judge. The judge would have two tasks before. One is to consider whether there was any other provision, including the 2012 remedial order, which was never appealed, which explicitly adopted the 14-day requirement and which is binded. No, no, no. That issue is in front of us right now. Why would we remand that issue? Well, your question, I think, Your Honor, was that the text of the judgment of the 2007. Right, the text of neither the judgment nor the 2012 order. I'm sorry. I didn't understand that. Okay. So if the court said that neither the 2007 order nor the 2012 order were binding or required this, then the matter would be remanded to the district court on the additional issues that the district court, Judge Ponser, did not adjudicate concerning whether or not there was compliance with the remedial plan. And since the district court never reached the secondary argument made by the state based on Milliken and Horne, would that issue then also go back on remand to the district judge, I think, who's now handling it? The defendants have not asked for either a, in fact, in their motion to the district court. They've not asked for relief from the injunction. They've only asked for relief from these two requirements. Both the district court in its 2019 opinion and in our briefs recognize that the defendants can, if they so choose at any time, file a motion under Rule 60B. They have not done so at any time. I think you heard Mr. Hammond's answer of why not. But they could do that. They could do that on remand. That's correct. And put it more firmly into the Horne versus Flores set of considerations. That's correct. Okay. Just one more thing, and then Judge Lopez. They say you can come in on the preliminary injunction in the future. They would, in their view, you're limited to the actual text of the orders 2007-2012. Doesn't that give you some relief there? Well, it does if we do have another option, if that's true. But at the moment, the district court judge made a finding, uncontroverted factual finding, that the provisions of the order, and remember now that there were four orders, because the defendants keep talking about the remedial plan, the judgment. First there was an order in 2007, March, excuse me, February of 2007, which said that the defendants must cure all Medicaid violations and provide services promptly. Then there was a second order in the same year in July. That second order is what adopted what's known as the injunction or the judgment. As part of that order, Judge Ponser noted in footnote one that it was not only the judgment that was being imposed, that the earlier order, the February 2000 order, had its own binding effect. After the two 2007 orders had been adopted, neither of which were appealed, the plaintiffs filed their noncompliance motion in 2011, renewed it, excuse me, 2010, renewed it in 2011, and two more orders were entered. One was an order in November of 2011 that ordered MassHealth to take to effectuate management strategies to eliminate waiting lists for ICC. And in addition, afforded MassHealth the opportunity to develop a timeliness standard. Then there was a fourth order that was entered, the one we've talked about, was entered in 2012 in March. Again, never appealed. Cold order, and that remedial order, whether it be seen as a clarification or a modification or just an implementation of the earlier orders, explicitly said 14 days. And that 14 days came from MassHealth. It came from MassHealth operating pursuant to the regulation, and in answer to your question earlier to my brother council about other states, the available data about other states was gathered by MassHealth. This was in their motion. They said we looked at other states, we made our own comparisons, and we think that our 14 days is in the ballpark. And this wasn't ours. It was many, but that was the basis. Today is many years later. Thank you. Council, I may have misunderstood the Commonwealth statement, and they can correct me. I thought they said that there actually, perhaps this was in 2012, there was some discussion of possibly amending the judgment itself to incorporate this 14-day requirement, but that was never done. Are you aware of any such discussions about possibly amending the judgment? My impression was, and they should correct me if I'm wrong, that if they had thought that this 14-day, which was reflected in the remedial order that you've described, was actually going to be incorporated in the judgment, they would not have agreed to that. Are you aware of any such discussions? I'm not aware of any such discussions. What I am aware of is that they came to the district court with that standard. They told the district court that they thought that standard was binding. They said it would be, it was consistent with their regulations, and I quote, they said that children have a right to expect the services within that time frame. Once they told the district judge that they were going to live with that standard, it was their standard, it was based on their analysis, it was done in conjunction with medical professionals, and then it was adopted. The district court judge then incorporated it in an order, and the defendants never repealed. This was a remedial order of the district court, whether we call it a formal modification or a remedial order that clarifies that. You know, in Horns, the Supreme Court says it doesn't matter that they didn't take an appeal. It just doesn't play into all of this. If anything, in some ways, it's admirable that the Commonwealth tried to work this out. But you were asked a question that I don't think you've quite answered, and that is, wasn't the district court specifically asked to modify the 2007 injunction in 2012, twice by your clients, and it refused to do so? It denied the motion. Pardon me. That's not quite right. Then address that, please. There were two aspects of this timeliness standard. The first aspect was what MassHealth did in 2012, and what the district court did with its order in 2012. It then went on to, as was mentioned, encourage the parties, in order to avoid more evidentiary hearings and more motions, to work together to develop disengagement standards. We did that in 2013, submitted a joint stipulation that the court approved. We did it again with more objective measures in 2016. Your brother represented that you twice moved in this 2012 time period to modify the injunction, and the district court denied that. Is that accurate? Not in the 2012 time period. When? In 2017. Let me try to explain this. After the district court urged us to try to work together, we took the 14-day time standard, and everyone agreed to use the 14-day time standard as a basis for measuring timely services. We then negotiated a stipulation that said so many children will receive ICC services, some percentage of all children will receive these services by this date, some percentage more, a higher percentage by that date, and so on. It was that incremental improvement of performance that the plaintiffs moved, we called them disengagement measures, that the plaintiffs moved to modify or incorporate in the underlying 2007 order. It was that incremental change that the district court denied without prejudice. There is a motion pending before the district court again, because in June 2008, the district court asked the plaintiffs, if they would, or invited the plaintiffs if they wished to, to submit another motion to incorporate the incremental changes. The incremental changes, in other words, are different than the obligation to provide the services in 14 days. One was a voluntary negotiated thing that had different benchmarks and incremental improvement. It was that that the district court denied, and then... In 2017. That's correct, and then in June of 2018, invited the plaintiffs to refile that motion, and then it notes in its order, the order on appeal, that it has not reached that. So if I could correct myself to an earlier question you asked, Judge Lynch, you said, what is remaining before the district court on remand? There really are two issues I should have been clearer. The first issue is the aspects of compliance or noncompliance with the remedial plan that the district court did not reach, and second, the plaintiff's motion for modification to incorporate these incremental measures. Okay, thank you. So the district court's 2019 decision, which indicated that the very purpose of its remedial plan, and its four earlier remedial orders, none of which had been appealed, was to ensure that the remedial services were provided promptly, and not just that the services were created and at some unknown date the children would actually get the treatment. The district court judge noted in this 2019 opinion, that reasonably competent services for these children make the difference between a life and a living death, and in sometimes a literal death, as a quote. As this court held in Bryson versus Shumway, there's no question that these Medicaid provisions are enforceable. And as this court looked at it in Hawkins, a similar EPSDT case, where the issue was were the services being provided promptly from the time of request, the court said we need to look at the consent decree provisions as well as the federal law. Here, the district court, in trying to give meaning to the general term reasonable promptness, and the Medicaid EPSDT's mandate for timely services, looked to MassHealth to give that meaning. So rather than the court come up with its own standard of what timely services were, or decide that services that didn't happen in two days or three days, as MassHealth had originally said, were not prompt, it said to MassHealth, what do you think is timely? What do you believe is reasonably prompt? And then it deferred to that decision from MassHealth and incorporated into that 2012 law. Counsel, can you comment on the Commonwealth has referred a number of times in its argument to the provision in the 2007 judgment that the monitoring will end in 2012. And they said that they are now relying upon that provision and arguing that it should be terminated. And I have noted there were these repeated extensions of that, six months, six months, six months at a time. What was the status of those modifications to the judgment? Were those modifications to that provision that said that monitoring would end after five years? They were. The first one happened actually at the hearing in March 2012, when the judge was considering and then adopting MassHealth's 14-day standard. And the judge indicated that he didn't see a great likelihood, since he was just making clear what the timeliness standard was, he didn't see a great likelihood that three months later, which would have been five years in July of 2007, July of 2012, he didn't see a great likelihood that all monitoring should end. The defendants at the hearing assented to the extension. They then submitted motions, joint motions, with the parties on ten separate occasions. Each of those motions were entered as an order which extended the monitoring. But I understand their argument to be, yes, we certainly did extend while we were trying to negotiate all of this out. But come 2018, we could no longer do it. And so now we are going back and we're not agreeing to any more extensions. It seems to me that's the argument you have to respond to. Have they waived their right because they agreed earlier? Is that your argument? No. What they have done is there's no longer an automatic 2012 end to monitoring. Of course there isn't. But that it was voluntarily extended for a period doesn't mean the Commonwealth is committed to voluntarily extend forever. Absolutely. We have never contended. Again, the Commonwealth should comment on this. I understand their argument to be that all of those extensions that you've described did not constitute a modification of the judgment, so that they can now, in arguing that they should be freed of the monitoring requirement, can say it was supposed to end in five years and here we are in 2020 and it's still in place. That does seem to be what they're arguing. Do you understand their argument to be that? I didn't actually, Your Honor. I didn't understand that what is true is that they did extend it. They don't have to continue to extend it. They're not under an obligation. But the extensions that did exist, the ten extensions that were entered as orders of the court, were modificating. The judge found they were modifications of the original order. There's no question they, just like other extensions, which the court had answered, every time that the Commonwealth has asked for an extension, the court has allowed it. Just like when the defendants asked for their version of the remedial plan. So the underlying 2007 remedial plan that had a five-year end date for monitoring, that has been modified. Judge Ponser has found that they were agreed-to modifications. And there isn't any dispute about that, just like there isn't dispute that at some point in time, whenever the defendants want to call it quits and say that no more extensions, they're free to do that. But they have. Well, they have most recently. And that was what was behind the motion that they filed. That's right. They modified the order. They didn't modify it indefinitely. They modified it 10 times for specific time periods. And when the last time period expired, which was in June or July of 2019, the plaintiffs moved and asked Judge Stearns to continue offending appeal. He agreed. They opposed that. And they can oppose any future ones. But there is no question that there was an agreed-to modification. Well, they say there wasn't, but it's an argument. That's right. And so I think that the remaining points I just want to turn to are that, first, when the court entered its 2012 order, it did so after making a statement from the bench that it believed the defendants were substantially out of compliance with its underlying order. Actually, its two remedial orders and with its remedial plan, which is often called the judgment. None of those statements were contested. Instead, MassHealth did what we've talked about already, adopted a timeliness standard, as is required by federal law, and hasn't complied with that standard and hasn't complied with the order that adopted that standard. Until the defendants in their motion explicitly have disavowed, although they can certainly change their mind, seeking any relief under Rule 60B-5. As Judge Lynch has mentioned, they can at any time. Well, they have a logical inconsistency issue. They think the injunction doesn't apply here, so why would they move to modify it? I mean, that's the problem they have. In other words, the very purpose of the injunction, or the remedial plan, just like the very purpose of all four remedial orders, two in 2007, one in 2011, one in 2012, was to correct the violation of federal law. That he had found a long time ago. That kids were not getting timely and appropriate, timely and prompt treatment. And he said those violations still exist. The defendants own data. There's not any controversy about the data. It was, after all, MassHealth's data. And he found that whatever, that the data demonstrated that the situation was deteriorating. That is, the Commonwealth was falling further and further behind from its own 14-day standard. Thank you very much, Your Honor. Counsel, as part of your report, would you please clarify for my benefit what your position is about the status of that sunset provision with respect to monitoring? Certainly. I think the ambiguity in my earlier answer reflects ambiguity in the proceedings themselves, as to each time that we did expressly agree to each of the six-month extensions that the court entered, I don't think we conceived of them as formal modifications of the judgment. But we also, that was kind of an academic distinction at the time, because we had agreed not to pursue any relegation. We had agreed not to pursue any relegation. We just treated them as orders of the court, orders of the court that said for the ensuing six months, the monitoring and reporting requirements. Well, if you have a judgment that specifically says that the monitoring will end in five years, and then you have agreements that extend it six months, six months, and six months, what can that be other than a modification of the judgment? No, I understand. I understand the question. I think the better answer is, even if they were modifications of the judgment, they were modifications entered pursuant to a voluntary agreement of the parties, which is one of the ways that the judgment said the judgment could be modified. And that starting in 2018, it was no longer a voluntary agreement of the parties. So why doesn't that same rationale apply to the 14-day extension? The 14-day extension of the 14-day period for implementing the ICC program, again, that was an agreement that was reached. And so why doesn't, in the same way that the agreement to extend the sunset provision six months at a time, why isn't that agreement on the 14-day period similarly a modification of the judgment? The original judgment does not have such specification. It speaks in very general terms. And why isn't that also a modification of the judgment? If it was considered as an enforceable modification of the judgment, we would have sought to appeal from it. So, you know, I think that's different in kind from this sort of informal agreement to continue extending the monitoring period until we didn't. At which point I think the status quo ante kicks in, which is that the monitoring is for a finite period of time, albeit no longer for just five years. But until such time after the five-year sunset provision that we cease to agree to the extension. And so that's where I think we are now. And those are the rights we attempted to enforce with this motion. The only other comment I just wanted to make was Judge Lynch asked me earlier why we had cited cases like Horn and Milliken in our original motion when this was not a 60B5 motion. And it's obviously not a consent decree. Those cases are... I mean, they're obviously facially distinguishable in a number of ways. But we cited them for what I would suggest their core meaning is, which is the repeated exhortations from the Supreme Court to federal district courts that states still retain sovereignty in their administrative programs. That the courts can and should exercise jurisdiction over them until such time as federal law violations have been cured. But once they've been cured, the autonomy over the program has to revert back to the state. And that's what we're trying to do here. That's why we're seeking freedom from monitoring and reporting requirements. Because that is a significant incursion into state sovereignty here where we need to discuss every operational detail of the program. And we need to do that with other stakeholders in a way that we don't have to do with other mature Medicaid programs. We're trying to get it on an equal footing with all of the other programs that MassHealth operates. If the court has nothing else. Thank you.